**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| L.E., | : | |
| *BY & THROUGH HIS PARENTS, DE & LME,* | : | |
| and DE & LME, *EACH INDIVIDUALLY,* | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 20-2096 |
| | : | |
| METHACTON SCHOOL DISTRICT | : | |

**MEMORANDUM**

**SURRICK, J.**                                                                                     **APRIL 25, 2024**

Presently before the Court is Plaintiffs' Motion for Summary Judgment on the

Administrative Record (ECF No. 13).  In this case, Plaintiffs, a minor ("L.E.") represented by his

parents ("Parents") and his Parents, individually, (collectively "Plaintiffs"), appeal an

administrative decision of a Due Process Hearing under the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*  Plaintiffs assert that the Hearing Officer

erred in finding that the Methacton School District ("District") provided L.E. with a Free

Appropriate Public Education ("FAPE") and that Plaintiffs were not entitled to tuition

reimbursement for L.E.'s private placement.  For the following reasons, Plaintiffs' Motion will

be granted in part and denied in part.

## I.   BACKGROUND

L.E. has a hearing impairment due to a condition present at birth, hypotonia, and deficits

in developmental maturity and processing speed.  (Administrative Record ("AR"), Pennsylvania

Special Education Hearing Officer Final Decision and Order, 1/31/20, Findings of Fact ("FF"),

ECF No. 7, ¶¶ 2-5.)  He has "some hearing loss and uses hearing aids."  (*Id.,* ¶ 2.)  L.E.

displayed difficulty focusing on and maintaining attention to tasks and, in the fall of 2014, L.E.'s

evaluations showed evidence of Attention Deficit Hyperactivity Disorder ("ADHD").  (*Id.,* ¶ 6.)

When L.E. was finishing sixth grade, in May 2017, his parents requested an

Individualized Educational Program ("IEP") to address his hearing impairment and gross motor

weaknesses, and his evaluation also showed speech and language deficits.  (*Id.,* ¶ 7.)  The IEP

provided for "preferential seating near the teacher and away from noise; teacher and student use

of the audio equipment and/or repetition of verbal discussion; monitoring of auditory

comprehension; . . . co-taught classes;" as well as additional academic support, instructions, and

time to complete assignments.  (*Id.,* ¶ 11.)  At a May 2017 IEP meeting, Parents asked for a full

evaluation of L.E.  (*Id.,* ¶ 12.)  The reevaluation "should have been completed no later than early

November 2017."  (AR, Pennsylvania Special Education Hearing Officer Final Decision and

Order ("Decision"), at 39 (ECF pagination).)

### A.      2017-2018 School Year

L.E. struggled throughout seventh grade.  (*Id.,* ¶ 14.)  Parents had requested the IEP in

May 2017, in part, because they were spending "significant amounts of time assisting [L.E.] in

completing" homework.  (*Id.*)  Parents would take shifts working with L.E. to "teach[] him

almost for the first time" his course materials, sometimes until 11 at night; 20-minute

assignments would take an hour and a half to complete.  (AR, N.T. 856-57; S-26, at 1.)  L.E. was

unable to complete his homework without assistance.  (*Id.* at 871.)  In one class, L.E. was

receiving a zero on his classwork and 40% on his quizzes.  (AR, N.T. 1123.)

L.E. used hearing aids and a FM system, which transmitted sound from a FM microphone

or transmitter to a receiver attached to his hearing aid.  With the FM system, he could hear 85

percent of spoken language in a quiet room.  (*Id.* at 866.)  However, he "did not have the audio

equipment available in classes at all times." (AR, FF ¶ 15.)  L.E. often told teachers he did not have the FM system or that it was broken. (*Id.,* N.T. 504.)  One of L.E.'s teachers testified that other students did not use the FM microphone, contrary to the requirements in his IEP. (*Id.* at 1093).  The Hearing Officer found that when the equipment was not available, "teachers used other means to ensure that [L.E.] had access to audio content including directions." (*Id.*)  Despite this, teachers were aware of—and discussed among themselves—L.E.'s non-use of his audio equipment and failing grades, but they determined that the concerns did not require them to take action and felt that his emotional and academic difficulties were not unusual for a student of his age. (*Id.,* FF ¶¶ 19-20.)

In February 2018, L.E. created a social media account and threatened multiple students online. (*Id.,* ¶ 28.)  L.E. was suspended, and the District completed a reevaluation report on March 9, 2018. (*Id.*, ¶¶ 28, 30.)  L.E.'s auditory functioning was assessed, and the results showed that he had difficulty with understanding speech when background noise was present, and that using his audio equipment improved his hearing and understanding, even though L.E. appeared reluctant to use it consistently. (*Id.,* ¶ 37.)  The report recommended more ongoing monitoring so that L.E. could have additional academic and organizational support. (*Id.,* ¶ 40.)  Additional recommendations included assigning a case manager to meet with L.E. during one period and providing semiweekly hearing support services. (*Id.,* ¶ 41.)

However, as a result of L.E.'s disciplinary infractions, the District gave Parents two options: either L.E. would be expelled or he could be placed in a therapeutic school for the remainder of the school year and the following year. (*Id.,* ¶ 44; S-21.)  Parents chose the latter option, and L.E. was to be evaluated again in the spring of 2019. (*Id.*)

### B.     2018-2019 School Year

In the fall of 2018, L.E. began eighth grade at the Lincoln Center ("Lincoln"), a school intended for short-term placements for students with emotional and behavioral needs.  The school offered small class sizes and regular group and individual counseling, and there were approximately twenty-five students in the school.  (*Id.*, ¶¶ 98, 100, 102, 105.)  Parents requested a reevaluation, and the resulting IEP identified the following needs: "quiet work environment; written communication skills; repetition; coping strategies and self-advocacy skills; vocabulary and language comprehension; listening comprehension across environments; following directions; extra time for processing and task completion; prompting for attention; and use of appropriate audio equipment."  (*Id.,* ¶ 44.)  Parents also obtained a private neuropsychological evaluation by Dr. Jennifer Badgley, who diagnosed L.E. with Other Specified ADHD, (*Id.* S-26 at 5), and L.E.'s school counselor diagnosed him with ADHD.  (*Id.*, N.T. 722).  The neuropsychologist also recommended small class sizes and individualized support to review and reteach materials at a slow pace.  (*Id.,* ¶ 58.)  At Lincoln, L.E. no longer used his FM transmitter.  (*Id.*, N.T. 620.)  In March 2019, an additional reevaluation occurred.  (*Id.,* FF ¶ 62.)  By the end of his term at Lincoln, L.E. was no longer failing his classes or threatening other students; in fact, he was doing well socially and was earning A's and B's.  (*Id.,* ¶ 99.)

### C.     2019-2020 IEP

In April 2019, L.E.'s team developed a new IEP for his prospective return to the District for L.E.'s ninth grade.  (*Id.,* ¶ 63.)  Teachers recommended small classes and access to a counselor, and program modifications included:

> preferential seating near the teacher and away from noise; teachers facing Student and ensuring Student's attention during instruction; teacher and student use of the audio equipment and/or repetition of verbal discussions; monitoring of auditory comprehension; self-advocacy for hearing support; preteaching and review;

vocabulary support and instruction; repetition of directions; closed captioning; direct instruction in reading comprehension; check-ins for organizational support with the case manager; prompting and redirection as needed including for written expression; counseling; extra time as test and assignment accommodations; copies of notes and study guides; limitation on physical activity; and adaptive physical education with physical therapy consultation.

(*Id.*, ¶¶ 65, 69.) L.E. was also to receive weekly individual hearing support, audiological services once per semester, counseling three times per week, and physical and occupational therapy consultation. (*Id.*, ¶ 70.) The team met again the following month to add several modifications, including ensuring access to extra textbooks at home and school, online physical education coursework, and modified curricula in two subjects. (*Id.*, ¶ 74.) Parents sought tuition reimbursement so that L.E. could continue to attend Lincoln, and so the team met again in August 2019 and added additional components, including "allow wait time for processing" and "gradual addition and chunking of homework since [L.E.] had not had homework at the AES." (*Id.*, ¶ 75.) L.E.'s classes would generally be cotaught with approximately sixteen students. (*Id.*, ¶ 89.)

### D.      Judicial Proceedings

Both the District and Parents sought judicial relief. The District sought an injunction in the Montgomery County Court of Common Pleas to require L.E. to return to the District, which was denied.

Parents initiated a Due Process Hearing under the IDEA before the Pennsylvania Office of Dispute Resolution, alleging that the District denied L.E. a FAPE in 2017-2018 by failing to identify L.E.'s ADHD and failing to ensure use of his audio equipment, and they asserted that the 2019-2020 IEP was unsatisfactory. (AR at 8, 39.)

The Hearing Officer found in favor of the District and denied Parents' requests for compensatory education and tuition reimbursement. With respect to the 2017-2018 school year,

5

the Hearing Officer concluded that a substantive denial of FAPE did not result from delays in diagnosing L.E. with ADHD and identifying "some weak academic skills." (*Id.* at 39.) The Hearing Officer found that a procedural error occurred when the reevaluation requested by Parents was not completed within sixty days after they requested it, as was required, and the District did not "promptly seek their written permission" for the reevaluation. (*Id.*) However, the Hearing Officer concluded that "this procedural violation did not significantly impede Parents' ability to participate in educational decision-making or operate to deny Student [a] FAPE." (*Id.*)

Further, Parents claimed that the March 2018 reevaluation report was not sufficiently comprehensive to develop an appropriate IEP. However, the Hearing Officer found, by a preponderance of the evidence, that the March 2018 reevaluation report met all evaluation requirements and that the IEP that followed addressed the needs articulated in the report and did not yield materially different needs than those addressed in the May 2017 IEP. (*Id.* at 39-40.) The Hearing Officer also found that the "credible testimony of [L.E.'s] teachers did not reveal any emotional or academic difficulties throughout the 2017-2018 school year, or needs beyond those in the IEP that was implemented, that indicated the presence of additional special education needs." (*Id.* at 40.)

Parents challenged the District's implementation of the May 2017 IEP and, in particular, claimed that L.E.'s audio equipment was not always used. (*Id.* at 40.) However, the Hearing Officer credited the "persuasive and collectively consistent testimony of [L.E.'s] teachers," who testified that they were aware of this issue and were able to successfully compensate and ensure through other means that L.E. did not miss audible content when the audio equipment was not present. (*Id.* at 40-41.) In addition, with respect to Parents' concerns about L.E.'s academic

skills, the Hearing Officer found that standardized assessments of L.E.'s achievement during the 2017-2018 school year did not support their concerns, and that "[t]he preponderant evidence does not establish a denial of FAPE on procedural or substantive grounds during the 2017-2018 school year." (*Id*. at 41.)

Parents also challenged the District's proposed program for the 2019-20 school year. However, the Hearing Officer concluded that it was satisfactory: The 2019-2020 proposed program incorporated all available information and was "unquestionably . . . reasonably calculated to provide meaningful educational benefit in the least restrictive environment." (*Id*.) Nearly all of the recommendations of the private neuropsychologist Parents hired were included in the August 2019 IEP proposal. (*Id*.) L.E. would receive services to support the goals enumerated in the IEP and would be in small classes. (*Id*. at 42.) The IEP was designed to enable L.E. to transition back to high school, and these provisions were "comprehensive, detailed, and reflective of careful consideration" of Parents and L.E.'s concerns. (*Id*.) The Hearing Officer concluded that Parents' concerns about L.E. returning "were genuine and quite understandable," but "their subjective concerns cannot overcome the contrasting evidence in the record." (*Id*.) Employees of the District testified that they anticipated that L.E.'s return would have a limited impact on L.E.'s peers, and the Hearing Officer concluded that this testimony was "logical and quite convincing, and confirmed the appropriateness of the proposed IEP provisions that were the result of thoughtful planning and reflection by the team to address such apprehension." (*Id*. at 42.) The Hearing Officer concluded that the evidence "does not establish that [L.E.] requires the extremely small setting that [Lincoln] provides, nor does it preponderantly defeat the District's August 2019 proposed program at its high school." (*Id*.)

In addition, Parents claimed that the August 2019 IEP was deficient because it lacked a baseline for the written expression goal.  However, the Hearing Officer concluded that this deficit "simply cannot, standing alone, render the proposed IEP that is otherwise substantively appropriate fatally flawed," and that the IEP was "unquestionably designed to address [L.E.'s] known needs and . . . do[es] so appropriately and adequately even without the mathematical precision that might equate to an ideal program."  (*Id*. 42-43.)  After finding that L.E. was not denied a FAPE while enrolled in the District, the Hearing Officer did not award compensatory education.  (*Id*. at 43.)  Because the Hearing Officer concluded that the proposed program for the 2019-20 school year was appropriate and did not deny L.E. a FAPE, she found no basis to award tuition reimbursement.  (*Id*.)

L.E. and Parents initiated this action in federal court, seeking judicial review of the Hearing Officer's determination.  (Compl., ECF No. 1.)

## II.  LEGAL STANDARD

We review the decision of a Special Education Hearing Officer pursuant to the IDEA under "a nontraditional standard of review, sometimes referred to as 'modified *de novo*' review."  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010) (citations omitted).  A district court reviewing an IDEA decision must make its own findings by a preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C)(iii).  However, we must give "due weight" to the Hearing Officer's findings.  *Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982).  We consider the Hearing Officer's factual findings to be "prima facie correct," and although we are free to accept or reject these findings, we must explain our reasons if we decline to accept them.  *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 271 (3d Cir. 2003).  When analyzing any live testimony delivered by

witnesses before the Hearing Officer, we give "special weight" to the Hearing Officer's credibility determinations. *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). We must accept the Hearing Officer's credibility determinations, "unless non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 529 (3d Cir. 1995), *amended* (Oct. 24, 1995). In this context, the word "justify" requires essentially the same standard of review given to a trial court's findings of fact by a federal appellate court. *Shore Reg'l*, 381 F.3d at 199 (citation omitted).

Claims for "tuition reimbursement are subject to plenary review as conclusions of law" and "whether the District fulfilled its FAPE obligations [is] subject to clear error review as [a] question[ ] of fact." *P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009). "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012).

Adjudicating a "motion[] for judgment on the administrative record in IDEA cases is not a 'true summary judgment procedure,' but rather is effectively a 'bench trial on a stipulated record.'" *David G. v. Council Rock Sch. Dist.*, No. 06-1523, 2012 WL 1231812 at *2 (E.D. Pa. Apr. 10, 2012) (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993)).

Importantly, we are not "to substitute [our] own notions of sound educational policy for those of local school authorities." *State-Operated Sch. Dist. of Newark*, 336 F.3d at 270 (quoting *MM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 531 (4th Cir. 2002)). "When schools use their expertise to address each child's distinct educational needs, we must give their

judgments appropriate deference." *K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 250 (3d Cir. 2018).

## III.  DISCUSSION

Plaintiffs move for summary judgment on the administrative record.  Plaintiffs argue that the District did not provide L.E. a FAPE during the 2017-2018 school year, before he transferred to Lincoln, and that he is entitled to compensatory education as a result.  (Mot., ECF No. 13-1, at 5, 7-20.)  We conclude that Plaintiffs are entitled to relief, although we direct the parties to confer about how the compensatory education should be awarded.  Plaintiffs further argue that L.E. was not offered a FAPE by the 2019-2020 proposed IEP that would have governed his return to the District, and that they are entitled to tuition reimbursement as a result.  (*Id.* at 21-39.)  We hold that Plaintiffs are not entitled to relief on this issue, as we conclude that the 2019-2020 IEP would have provided L.E a FAPE.

### A.     The District did not provide L.E. a FAPE during the 2017-2018 school year.

First, we assess whether L.E. received a FAPE during the 2017-2018 school year.  We hold that the procedural delay in conducting the requested reevaluation report amounted to a substantive harm, in violation of the IDEA.

#### 1.     Deprivation of FAPE

The IDEA "offers States federal funds to assist in educating children with disabilities." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017).  In exchange for the federal funds, States "must provide a free appropriate public education—a FAPE, for short—to all eligible children."  *Id.*  Failure to conduct a timely reevaluation following a parent's request is a procedural violation of FAPE, but "[a] procedural violation of the IDEA is not a per se denial of a FAPE."  *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66

(3d Cir. 2010) (internal citation omitted).  "[R]ather, a school district's failure to comply with the procedural requirements of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents." *Id*.  A substantive harm only occurs if the preponderance of the evidence shows that the procedural inadequacies:

(i)     [i]mpeded the child's right to a FAPE;

(ii)    significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or

(iii)   caused a deprivation of the educational benefit.

34 C.F.R. § 300.513(a)(2).

In order to provide a FAPE, a state "must supply an education that provides 'significant learning' and 'meaningful benefit' to the child." *Ridley Sch. Dist.*, 680 F.3d at 269.  This is done by providing an IEP that is tailored to the unique needs of the child and "reasonably calculated to enable the child to make appropriate progress in light of the child's circumstances." *Endrew F.*, 580 U.S. at 404.  "The benefit to the student must be more than *de minimis*." *Perkiomen Valley Sch. Dist. v. R.B.*, 533 F. Supp. 3d 233, 249 (E.D. Pa. 2021) (citing *M.C. v. Central Reg'l Sch. Dist.*, 81 F.3d 389, 393 (3d Cir. 1996)).

The Hearing Officer correctly found that the District failed to complete the evaluation that Parents requested in May 2017 in a timely manner.  The evaluation should have been conducted no later than November 2017, but was not completed until March 2018, ten months after it was requested.  (AR, Decision, 35) (also noting that the District failed to "promptly seek their written permission for that reevaluation").  However, the Hearing Officer erred in determining that L.E. was not denied a FAPE.

The facts as laid out by the Hearing Officer's findings and supplemented by the administrative record show that L.E. was academically struggling well beyond what would be

appropriate for someone receiving a FAPE.  Specifically, L.E. was denied a FAPE because the District failed to adequately ensure he could hear lessons and discussions in class and because it failed to accommodate his ADHD symptoms, whether diagnosed or not.

First, we address the use of L.E.'s audio equipment.  While it is true that L.E. did sometimes fail to bring his hearing aids to class, the record also shows that he told teachers that the hearing aids were broken, (*Id.,* N.T. 504), and the FM microphone was not used properly by other students as required by L.E.'s IEP.  (*Id.* at 1093.)  It was the District's responsibility to ensure that L.E. had access to working hearing assistive technology.  34 C.F.R. § 300.113 ("Each public agency must ensure that hearing aids worn in school by children with hearing impairments, including deafness, are functioning properly."); (AR, N.T. 289.)  His teachers saw that he did not use his audio equipment, and they even discussed this among themselves after the reevaluation was requested, but the District did nothing.

Second, L.E.'s undiagnosed ADHD further exacerbated issues with comprehending class materials.  The Hearing Officer stated that Parents' evaluator, Dr. Badgley, "did not diagnose ADHD but suggested that ADHD nonetheless described [L.E.'s] deficits."  (*Id.,* FF at ¶ 55.)  However, we disagree with this reading of the documents in the record.  In Dr. Badgley's report, she states, "[o]verall, [L.E.] does not meet the classic diagnosis for ADHD; however, his symptoms can best be described under the diagnosis of Other Specified ADHD related to his executive function and processing speed difficulties."  (*Id.,* S-26, 5.)  Under "Diagnostic Impressions," the first listed diagnosis is, "Other Specified Attention-Deficit/Hyperactivity Disorder (DSM-5: 314.01/ICD-10; F90.8) – Related to Executive Function and Processing Speed Difficulties."  (*Id.*)  This Court finds L.E. was diagnosed with ADHD.  And the record shows that L.E.'s processing and focus issues exacerbated his difficulties comprehending his lessons.

These facts lead the Court to conclude that L.E. was not learning much or any information in class as a result of the District's failure to provide him adequate resources, which required Parents to attempt to compensate for that loss by spending substantial amounts of time each night relearning the material to no avail.  (*Id.* at 856-57) (Parents spent "significant amounts of time assisting [L.E.] in completing" homework and took shifts working with L.E. to "teach[] him almost for the first time" his course materials, sometimes until 11 at night).  L.E.'s ADHD, which affected his ability to understand his lessons, was only identified by Dr. Badgley due to Parents' efforts to better understand L.E.'s academic issues.  Yet, critically, the District's delay in evaluating L.E. meant that it only provided additional academic and organizational support and an assigned caseworker guaranteed by the March 2018 IEP five months after he was entitled to them.  (AR, FF ¶ 40.)  The District relies on *Coleman v. Pottstown Sch. Dist.*, 983 F. Supp. 2d 543, 571-72 (E.D. Pa. 2013), *aff'd in part*, 581 F. App'x 141 (3d Cir. 2014), for the proposition that failure to include a particular secondary exceptionality in the IEP is not necessarily a violation of the IDEA.  (Opp'n, ECF No. 14, at 14 n.3.)  However, *Coleman* is not applicable here.  In *Coleman*, the plaintiffs failed to show how the educational program would have differed had the second diagnosis been identified.  983 F. Supp. 2d at 571.  An IEP should address symptoms, even without the label of a diagnosis, and here there is evidence in the record as to how the IEP and educational support L.E. would have received would have differed if it had been issued earlier as required.  For example, the March 2018 IEP added a caseworker and additional academic and organizational support based on L.E.'s symptoms, with or without an official diagnosis.  Further, the August 2019 IEP guaranteed even more additional support following L.E.'s official diagnosis.

We therefore disagree with the Hearing Officer, who concluded that "[w]hile the timing of the March 2018 RR and subsequent IEP do suggest that completion of the [reevaluation report] earlier in the school year may have resulted in earlier IEP revisions, the March 2018 [reevaluation report] did not yield materially different needs that were not addressed by the May 2017 IEP." (AR, Decision, 36.)  It is clear that something was very wrong with L.E.'s education, and the District did not timely meet Parents' request for a reevaluation.  L.E. put in immense effort outside the classroom to master the material with multiple failing grades to show for it. (*Id.* FF ¶ 14; *id.* N.T. 856-57; S-26, 1); (*Id.* N.T. 1123) (L.E. had a zero percent on classwork). In fact, the 2017-2018 and 2018-2019 school years provide an interesting comparison.  At the District, L.E. failed or otherwise severely underperformed in many classes, despite Parents' substantial at-home assistance.  At Lincoln, he earned A and B grades in smaller classes with ample educational and emotional support.  (*See Id.,* ¶ 99, 105).  While this dramatic difference is beyond what the IDEA requires schools to provide, it supports that L.E. was capable of academic success if given the right tools, yet the District refused to provide him with those tools for most of the school year.  The record shows that the progress that L.E. was making during the 2017-2018 school year was not appropriate in light of the circumstances.  Therefore, we hold that he was denied a FAPE during that period by virtue of the delays in completing his evaluation.

Finally, the District argues that "if there was any deprivation of FAPE, it was as a result of the supervening event of L.E. making terroristic threats, and nothing for which [the District] was responsible." (Opp'n at 5.)  This position is not supported by the administrative records. L.E. made the threats *four months* after the latest date his reevaluation should have been completed.  Even if the threats delayed L.E.'s reevaluation (and it is not clear that they did), his

14

reevaluation should have been completed months before.  For these reasons, we hold that the District denied L.E. a FAPE between November 2017 and March 2018.

       2.    *Compensatory Education*

"Under the IDEA, a district court is authorized to grant 'such relief as the court determines is appropriate, including attorneys' fees, reimbursement for a private educational placement, and compensatory education." *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 608 (3d Cir. 2015) (internal quotation omitted).  Compensatory education intends to put students with disabilities "in the same position they would have occupied but for the school district's violations of IDEA, by providing the educational services children should have received in the first instance." *Id.* (internal quotation omitted).  "Courts may grant an award of full days of compensatory education when impractical to parse the exact number of hours a FAPE was denied or when the [local education agency] demonstrated a complete failure to address a student's needs." *Kayla W. by & through Catrina J. v. Chichester Sch. Dist.*, No. 20-6082, 2022 WL 507482, at *7 (E.D. Pa. Feb. 18, 2022).

Based on the District's failure to provide L.E. a FAPE, L.E. is entitled to compensatory education in the amount of 6.5 hours per day.  The Court directs the parties to confer on the manner in which compensatory education should be provided.  *Kayla W.*, 2022 WL 507482, at *7–8 (directing the parties to confer on the manner in which compensatory education must be provided).  Moreover, because the Hearing Officer did not find that compensatory education was owed, the record lacks certain findings that are necessary to determine the appropriate award, including how many school days passed between the date that the IEP should have been implemented and L.E.'s suspension.  Therefore, the Court further directs the parties to confer on

the number of days owed and provide the Court with a proposal for the compensatory education

hours owed.

**B.      Parents are not entitled to tuition reimbursement for the 2019-2020 school year.**

"[P]arents who disagree with [a] proposed IEP are faced with a choice: go along with the

IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider

to be the appropriate placement." *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359,

370 (1985).  "[P]arents who unilaterally change their child's placement during the pendency of

review proceedings, without the consent of state or local school officials, do so at their own

financial risk." *Id.* at 373-74.  "Parents are entitled to tuition reimbursement under the IDEA for

unilaterally changing their child's placement to a private school if the following three elements

are proven: (1) the District failed to offer the student a FAPE; (2) the private placement is

appropriate; and (3) equitable considerations favor reimbursement." *Lauren G. v. West Chester*

*Area Sch. Dist.*, 906 F. Supp. 2d 375, 390 (E.D. Pa. 2012) (citing *Florence Cnty. Sch. Dist. Four*

*v. Carter*, 510 U.S. 7, 15-16 (1993)); *see also* 20 U.S.C. § 1412(a)(10)(C)(ii); 34 C.F.R.

300.148(c).  If parents enroll their child in a private school "without the consent of or referral by

the public agency," the court "may require the agency to reimburse the parents for the cost of

that enrollment if the court . . . finds that the agency had not made a free appropriate public

education available to the child in a timely manner prior to that enrollment."  20 U.S.C. § 1412.

First, we must assess whether the Hearing Officer erred in finding that the 2019-2020 IEP

provided L.E. with a FAPE.  We hold that the Hearing Officer did not err.  Here, the Hearing

Officer concluded: "The evidence in this case simply does not establish that [L.E.] requires the

extremely small setting that the [Lincoln] provides, nor does it preponderantly defeat the

District's August 2019 proposed program at its high school with the level and breadth of support

16

explicitly offered." (AR, Decision, at 38.) The Hearing Officer determined that "virtually every recommendation of the private neuropsychologist was included in the August 2019 IEP proposal, through annual goals and/or program modifications/items of specially designed instruction, with the exception of occupational and physical therapy for which permission to evaluate was sought." (*Id.* at 37-38.) We agree. The Hearing Officer's analysis on this issue is well-supported by the record.

However, Plaintiffs raise several challenges about the goals and baselines documented in the August 2019 IEP and allege that the District failed to adequately consider safety concerns. (Mot. at 22-35.) They urge us to conclude that L.E. was denied a FAPE in 2019-2020. (*Id.* at 22-23.) We will address these challenges in turn.

### 1.    The 2019 IEP's Goals and Baselines

First, Plaintiffs critique the goal that L.E. should independently request the "closed captioning support for media, FM System, extra time on assignments/assessments, and repetition of instructions/directions to task on 85% of opportunities over 2 consecutive marking periods" as needed, and that the baseline is that L.E. "does not currently request accommodations." (Mot. at 30) (quoting AR, S-36 at 54). Essentially, Plaintiffs argue that since L.E. is entitled to these accommodations, he should not be required to request them. They maintain that requiring L.E. to request these accommodations from his teachers would temporarily deprive him of accommodations, and there is no set time at which the teachers are to provide accommodations, absent a request. (*Id.* at 30-31.) However, Melissa Kremer Wychunis, an emotional support teacher in the District, explained that teachers were required to ask L.E. each morning to request closed captioning, even if he was already aware that he was supposed to request captioning, and teachers were also supposed to prompt him for other accommodations, including extra time for

assignments.  (AR, N.T. 226-29.)  Plaintiffs also note that the baseline for this goal was reported as "does not currently request accommodations," but that L.E. had previously requested extra time in seventh grade.  (Mot. at 30) (quoting AR, N.T. 892.)  However, L.E's prior experience does not render the baseline inaccurate, since the testimony was about his performance over a year prior to the 2019 IEP, not his current performance.

Second, they assert that the hearing support and hearing support comprehension have an unclear goal and the baseline does not match the goal.  (*Id*. at 31-32.)  This is not supported by the record.  For L.E.'s hearing support, its baseline describes him as "85% in a quiet environment using auditory-visual presentation," indicating that he understands 85% of speech in such an environment, and indicates his goals are to answer comprehension questions of a grade-level reading passage that is read to him under conditions of "increased background noise" and without using visual cues.  (AR S-36, 49.)  Plaintiffs argue that comparing auditory-visual based comprehension and solely auditory comprehension is not possible.  (Mot. at 31.)  We disagree—they both test listening comprehension in progressively less guided environments.  In addition, Plaintiffs maintain that L.E.'s hearing support goal of listing ten scenarios in which he has trouble hearing and identifying two strategies per scenario to improve comprehension is arbitrary, but then suggests a smaller number of proposed comprehension strategies.  (Mot. at 31.)  However, Plaintiffs' proposal seems to admit that the type of goal is reasonable, and only raises a narrow challenge with respect to the specific measurements that Plaintiffs themselves admit are not easily mathematically quantified.  The IEP's hearing support and hearing support comprehension goals were not deficient.

Third, they assert that the writing and counseling goals do not contain meaningful baselines.  (Mot. at 32.)  The District's supervisor of special education for grades five through

18

eight, Dr. Danielle Fowlston, testified that the writing baseline would be developed following an evaluation of a recent writing assignment by L.E. and suggested that the school was awaiting a writing sample from Lincoln in order to finalize the baseline.  (AR, N.T. 586-87); (*see* AR, Decision, at 38) ("That IEP did add a provision for immediately obtaining a baseline since information on that one skill was not yet available; here, it is also important to consider that Student had been in [Lincoln] for more than a full school year that was focused on therapeutic intervention.").  As for the counseling goal, the IEP suggests that L.E. should "build positive interpersonal skills using appropriate conflict resolution by" identifying his feelings, understanding others' perspectives, and identifying three appropriate coping mechanisms, and for the baseline, states "This is a new goal.  Counselor provided input shows concern for deficit in each area listed above."  (AR, S-36 at 53.)  While the District should have included a more substantive explanation for the above skills, this failure—in the context of the entire IEP—does not rise to the level of depriving L.E. a FAPE.  *See N.M., ex rel. M.M. v. The Sch. Dist. of Philadelphia*, 394 F. App'x 920, 923 (3d Cir. 2010) (characterizing failure to include certain annual goals and short-term objectives a procedural IDEA violation but observing that the IEP nevertheless provided a FAPE).

Finally, Plaintiffs note that the IEP did not contain a mathematics goal.  (Mot. at 32.) However, the District's supervisor of special education, Dr. Jamie Gravinese, testified that the IEP did not contain a mathematics goal because L.E.'s math teacher rated his performance at grade level.  (AR, S-36 at 23; N.T. 1205).

####        2.        *The 2019 IEP's Safety Considerations*

Plaintiffs also insist that the IEP did not adequately address the potential safety risk to

L.E. upon his return to the District, as a result of the terroristic threats he had made over a year

prior that prompted him to enroll at Lincoln.

The Hearing Officer concluded:

> Significantly, the provisions designed to enable Student to successfully transition
> back to the high school were comprehensive, detailed, and reflective of careful
> consideration of the Parents' and Student's concerns.  The Parents' apprehensions
> with that return were palpable at the hearing and, in this hearing officer's view,
> were genuine and quite understandable from their perspective.  Nevertheless, their
> subjective concerns cannot overcome the contrasting evidence in the record. In
> particular, the testimony of the experienced District professionals on the anticipated
> limited impact on peers of Student's return (*see, e.g.*, N.T. 133-35, 1292, 1409,
> 1411) was logical and quite convincing, and confirmed the appropriateness of the
> proposed IEP provisions that were the result of thoughtful planning and reflection
> by the team to address such apprehension.  The evidence in this case simply does
> not establish that Student requires the extremely small setting that the [Lincoln]
> provides, nor does it preponderantly defeat the District's August 2019 proposed
> program at its high school with the level and breadth of support explicitly offered.

(AR, Decision, at 38.)  The Hearing Officer did not err.  L.E. was guaranteed various forms of

emotional support, including daily study hall with an emotional support teacher/case manager,

daily access to a mental health specialist trained in trauma-informed counseling who was

available at all times, classes with a full-time instructional assistant, a teacher who would

monitor L.E.'s transition and be available at any time, a case manager who would meet daily

with the mental health specialist and guidance counselor, and a clinical team that met weekly.

(AR, FF ¶¶ 85-87.)  These provisions were in addition to L.E.'s other academic and

organizational support and small-sized classes.  In addition, Plaintiffs failed to identify any

specific potential danger to L.E. in returning to the District.  Accordingly, the IEP for the 2019-

2020 school year was sufficient.

Because L.E. was provided a FAPE under the 2019 IEP, we need not assess whether Parents are entitled to tuition reimbursement.

**IV.   CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion will be granted in part and denied in part. An appropriate Order follows.

**BY THE COURT:**


*/s/ R. Barclay Surrick*
**R. BARCLAY SURRICK, J.**
